IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2013 Term

_____

No. 11-0812

_____

FILED
March 28, 2013
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LAWYER DISCIPLINARY BOARD,
Petitioner

v.

BARRY J. NACE,
Respondent

_____

Lawyer Disciplinary Proceeding

LICENSE SUSPENDED AND OTHER SANCTIONS IMPOSED

_____

Submitted: February 19, 2013
Filed: March 28, 2013

Jessica H. Donahue Rhodes, Esq.          J. Michael Benninger, Esq.
Office of Disciplinary Counsel            Benninger Law
Charleston, West Virginia                 Morgantown, West Virginia
Counsel for the Petitioner                Counsel for the Respondent

The Opinion of the Court was delivered PER CURIAM.

SYLLABUS BY THE COURT

1.    "'In an attorney disciplinary proceeding based on a complaint charging professional misconduct and prosecuted by the Committee on Legal Ethics of the West Virginia State Bar for publicly reprimanding the attorney and for suspending the license of the attorney to practice law, the burden is on the committee to prove the charges contained in the complaint by full, clear and preponderating evidence.' Syl.Pt. 2 of *Committee on Legal Ethics v. Daniel*, 160 W.Va. 388, 235 S.E.2d 369 (1977)." Syl. pt. 1, *Committee on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

2.    "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. pt. 3, *Committee on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

3.    "'A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.' Syllabus point 3, *Committee on*

i

*Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994)." Syl. pt. 2, *Lawyer Disciplinary Bd. v. Morgan*, 228 W. Va. 114, 717 S.E.2d 898 (2011).

4.      "As soon as a client has expressed a desire to employ an attorney and there has been a corresponding consent on the part of the attorney to act for him in a professional capacity, the relation of attorney and client has been established; and all dealings thereafter between them relating to the subject of the employment will be governed by the rules applicable to such relation." Syl. pt. 1, *Keenan v. Scott,* 64 W. Va. 137, 61 S.E. 806 (1908).

5.      "Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: 'In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.'" Syl. pt. 4, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

6.     "In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession. Syl. pt. 3, *Committee on Legal Ethics v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987).

7.     "Mitigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." Syl. pt. 2, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

8.     "Mitigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13)

remoteness of prior offenses." Syl. pt. 3, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

9. "Aggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." Syl. pt. 4, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

Per Curiam:

This lawyer disciplinary proceeding was brought against Barry J. Nace ("Mr. Nace") by the Lawyer Disciplinary Board ("LDB"). The complaint giving rise to this action alleged ethical misconduct on the part of Mr. Nace and another attorney, D. Michael Burke ("Mr. Burke"). In our last term of Court, we decided *Lawyer Disciplinary Board v. Burke*, ___ W. Va. ___, 737 S.E.2d 55 (2012), adopting the sanctions recommended by the LDB and admonishing Mr. Burke for committing ethics violations. Upon an evidentiary hearing conducted by the Hearing Panel Subcommittee ("HPS") on October 10, 2011, the LDB found that Mr. Nace violated the West Virginia Rules of Professional Conduct, specifically Rules 1.1, 1.3, 1.4(a) and 1.4(b), 1.15(b), 8.4(c) and 8.4(d). The LDB, pursuant to the HPS's proposal in its March 21, 2012, report, recommends that Mr. Nace be suspended from the practice of law for 120 days without any requirement for reinstatement; that he provide community service through pro bono work for a total of 50 hours; that he satisfy any obligations imposed on him in the final disposition of the pending adversary proceeding in the United States Bankruptcy Court for the Northern District of West Virginia filed by the bankruptcy trustee, Robert W. Trumble ("Mr. Trumble"); and that he be ordered to pay the costs of the proceedings before the HPS pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

After a thorough review of the record presented for consideration, the briefs, the legal authorities cited, and the arguments of the LDB and Mr. Nace, we find

1

that Mr. Nace has committed ethics violations, and we impose the sanctions against him as recommended by the HPS.

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

The respondent, Barry J. Nace, has been practicing law since 1970. He has been a member of the West Virginia State Bar for more than 15 years, having been admitted to the Bar on March 19, 1997. He has also been admitted to practice law in Maryland, Pennsylvania, and the District of Columbia. Mr. Nace's practice is in Washington, D.C., with the law firm Paulson & Nace.

On February 5, 2004, Mr. Burke was hired by Barbara Ann Miller ("Ms. Miller") to represent her in a medical malpractice case involving her deceased husband. Shortly thereafter, Mr. Burke contacted Mr. Nace concerning the case. This was common practice with Mr. Burke and Mr. Nace; during their 20-year professional relationship, they had previously worked together on numerous medical malpractice cases. At Mr. Burke's request, Mr. Nace began evaluating Ms. Miller's case.

Later that year, on September 27, 2004, Ms. Miller filed a Chapter 7 Voluntary Petition in the United States Bankruptcy Court in the Northern District of West

2

Virginia.[1] Mr. Trumble was appointed as Interim Trustee of the bankruptcy estate. An order discharging Ms. Miller was entered on December 21, 2004.

On January 11, 2005, Mr. Trumble wrote to Mr. Burke to advise him that he, Mr. Trumble, had been appointed trustee of Ms. Miller's bankruptcy estate. Additionally, Mr. Trumble requested a valuation of the medical malpractice case in which Mr. Burke was representing Ms. Miller. Mr. Burke replied by letter dated January 25, 2005, that the medical malpractice claim was being reviewed by Mr. Burke's co-counsel, Mr. Nace, and that a valuation of the case could not be made prior to the completion of a medical review.

Mr. Trumble proceeded to send Mr. Burke and Mr. Nace separate letters on January 27, 2005, containing applications to employ special counsel, proposed orders authorizing the trustee to employ special counsel, and affidavits for both men to sign to accept employ as special counsel for the bankruptcy estate by the trustee, Mr. Trumble. The letter to Mr. Nace, signed by Kristi M. Hook, Certified Legal Assistant, on behalf of Mr. Trumble, stated, in part,

> Mr. Nace:
> Enclosed please find a copy of an Application to Employ Special Counsel, Order and an original Affidavit with regard to your appointment as special counsel in the

---

[1] Ms. Miller was represented by attorney William A. O'Brien in that proceeding.

3

referenced matter. I request that you review the enclosed documentation and if the same meets with your approval, please sign the Affidavit in the presence of a Notary Public and return it to me along with a copy of your Contingency Fee Agreement. Upon receipt of the same, I will transmit the documentation to the Bankruptcy Court for approval.

The affidavit sent to Mr. Nace stated, in part, "I, Barry J. Nace, Esquire, declare: . . . That I am willing to accept employment by the Trustee on the basis set forth in the Application to Employ filed simultaneously herewith. . . . I declare under penalty of perjury that the foregoing is true and correct." Both Mr. Burke and Mr. Nace signed and returned the affidavits to Mr. Trumble.

On March 3, 2005, Mr. Trumble filed the applications for the authorization to employ Mr. Burke and Mr. Nace as special counsel, and by order this request was granted the following day in the bankruptcy court. Mr. Nace denies having received notice that the order issued, stating that it was mailed to the incorrect address.[2] The LDB asserts that the bankruptcy court's records indicate that the mailed notice was not returned to the court as incorrectly addressed or undeliverable.

---

[2] Mr. Nace stated in his May 24, 2011, deposition testimony that his office had moved to a new location in March of 2005. The address to which the court mailed the March 4, 2005, notice of the entry of the order was Mr. Nace's former address. In the same deposition, Mr. Nace answered in the affirmative when asked if he had left a forwarding address for the post office, but he did not know how long mail was forwarded to the new address.

A complaint was filed on Ms. Miller's medical malpractice claim in the Circuit Court of Berkeley County, West Virginia, on June 17, 2005. The complaint named multiple defendants. On July 25, 2005, Mr. Burke notified Ms. Miller that he was withdrawing from her case because of a conflict of interest, but that Mr. Nace would continue to serve as her counsel in the matter. Mr. Burke did not provide the bankruptcy court or Mr. Trumble with notice of his withdrawal as counsel, nor did he submit a motion to withdraw.

In September of 2006, a partial settlement was reached with one of the defendants named in Ms. Miller's medical malpractice suit. The settlement totaled $75,000. Following the settlement, Mr. Nace wrote to Ms. Miller on September 26, 2006, stating, "[P]resumably you have a bankruptcy attorney and if so that person should call me so I know whether or not a check can be written to you." Mr. Nace now avers that he does not remember following up with Ms. Miller or her bankruptcy attorney. The proceeds of the settlement were distributed without the approval, authority, or knowledge of the bankruptcy estate's trustee, Mr. Trumble.

On October 30, 2006, Ms. Miller's case proceeded to jury trial against the remaining defendants. The jury returned a verdict awarding judgment in Ms. Miller's favor in the amount of $500,000, and judgment was entered on January 4, 2007. Mr. Burke did not participate in the trial of the case, nor did he participate in the subsequent

5

appeal.[3] The proceeds from the trial were paid out to Ms. Miller, again without the approval, authority, or knowledge of Mr. Trumble.

On July 27, 2007, Mr. Trumble sent a letter to Mr. Burke requesting an update on the status of Ms. Miller's medical malpractice claim. Mr. Burke's records indicate that on August 8, 2007, Mr. Burke forwarded this letter to Mr. Nace's office by faxing and mailing the same. The "Fax Cover Memorandum" from Mr. Burke's office was marked as having been delivered to "Gabriel" from "Lacy" on August 8, 2007. Lacy Godby was Mr. Burke's secretary, and Gabriel Assaad was an associate in Mr. Nace's office. Mr. Burke also phoned Mr. Trumble's office and left a message with Mr. Trumble's assistant that he was no longer representing Ms. Miller and to contact Mr. Nace's office. Mr. Nace denies receiving a copy of the July 27, 2007, letter, or the message left by Mr. Burke.[4]

On March 5, 2008, Mr. Nace sent Ms. Miller a check for $220,467.45 which represented Mr. Nace's calculation of her share from the proceeds of the medical

---

[3] This Court refused the appeal by an order entered on February 12, 2008.

[4] In his brief to this Court, Mr. Nace maintains that "Assaad never worked on Miller's husband's case" and that "there was nothing seen or recovered from a review of Nace's file to indicate that Assaad received and filed the documentation or brought it to Nace's attention."

6

malpractice case. Again, the distribution of these proceeds was made without the approval, authority, or knowledge of Mr. Trumble.

On October 10, 2008, Mr. Trumble sent letters to Mr. Burke and Mr. Nace advising that he had become aware of the resolution of Ms. Miller's case but that he had not received notice of the resolution, nor had he received the bankruptcy estate's portion of the proceeds from the case. This letter was not sent to Mr. Nace's correct address. A second letter, sent to Mr. Nace's correct address, was mailed on November 14, 2008. This letter requested settlement documents referred to in the October 10, 2008, letter. Mr. Nace responded to this letter on December 1, 2008, stating that he did not receive the October 10, 2008, letter and "that there was not any settlement and that the case was tried to jury verdict and then went on appeal and reported by the Court of Appeals when they declined to accept the defendants' petition." He also said, "I am not sure why you would expect us to contact you to obtain authority as to a settlement since there was no settlement."

Mr. Trumble replied by letter to Mr. Nace on January 5, 2009, stating that Mr. Nace had been hired to represent the trustee's interest in the medical malpractice action regardless of the case being settled, tried before a jury, or resolved on appeal. Furthermore, Mr. Trumble advised that Mr. Nace had violated his duty to his client, Mr. Trumble, and asked that Mr. Nace put his malpractice carrier on notice.

7

Mr. Nace wrote back to Mr. Trumble on February 4, 2009, denying that he had ever received the application for employ of special counsel, the order authorizing Mr. Trumble to employ special counsel, or the order authorizing his appointment as special counsel until receiving Mr. Trumble's January 5, 2009, letter. He further stated that he had not heard anything from Mr. Trumble since signing the affidavit in February 2005.

Mr. Trumble filed an ethics complaint against Mr. Nace on July 13, 2009. The Office of Disciplinary Counsel ("ODC") notified Mr. Nace of the complaint by letter dated July 16, 2009. By letter dated August 25, 2009, Mr. Nace responded to the ODC's letter. In this letter, he wrote, in part,

11. On January 27, 2005, Mr. Trumble, through his certified legal assistant sent a letter to me and Mr. Burke asking us to sign an affidavit.
12. I did so, routinely, and saw no other document nor heard anything else about the matter.
13. <u>Apparently</u> Mr. Trumble filed a trustee application to employ special counsel.
14. *I did not receive a copy of the trustee application to employ special counsel, which I subsequently learned existed.*

(Emphasis in original).

On October 5, 2010, Mr. Trumble filed a complaint against Mr. Burke and Mr. Nace in the United States Bankruptcy Court for the Northern District of West

Virginia alleging breach of contract and legal negligence as to the proceeds from the medical malpractice case.[5]

Pursuant to an investigative subpoena duces tecum, Mr. Nace attended a hearing before the Investigative Panel of the LDB on April 7, 2010. Mr. Nace appeared before the Investigative Panel of the LDB in Charleston, West Virginia, and gave a sworn statement. Again, he denied receiving the application to employ special counsel along with the affidavit sent by Mr. Trumble on January 27, 2005:

> Q And he [Mr. Trumble] said you did receive the application to employ special counsel along with the affidavit --
> . . . .
> Q And you're saying [late 2008 was] the first time you saw those?
> . . . .
> A [Mr. Nace] I can't tell you exactly when, but I can say without any question whatsoever in my mind that the first time I saw [them] was when those letters in November or December of '09 started floating around.

Also during the April 7, 2010, hearing, Mr. Nace denied that he knew Ms. Miller was involved in a bankruptcy proceeding at the time he distributed the $75,000 settlement. He said,

---

[5] The bankruptcy proceeding has been stayed pending the outcome of this case. Mr. Nace has filed a motion to lift the stay, but as of January 25, 2013, the stay has not been lifted.

9

I didn't know anything about Trumble. I really didn't. I didn't know about a bankruptcy at that point [at the time the $75,000 settlement proceeds were distributed], other than that affidavit that I signed, and I never heard from anybody on that whole thing.

. . . .

Yeah, I mean -- I mean, in all honesty, I don't sit around calling up people saying, "How's your bankruptcy been going?" that I don't have any knowledge of.

You know, I didn't -- if I had gotten a copy of the order, here's the -- if I had gotten a copy of that order, then the lights might have gone off . . . .

In his brief to this Court, Mr. Nace writes, "Nace does not deny he was made aware of Miller's bankruptcy filing in February 2005 when he received and signed the Affidavit sent to him by Mr. Trumble's office."

The subpoena, which commanded his appearance on April 7, 2010, also ordered that Mr. Nace produce certain documents. Specifically, the subpoena requested "your complete client file relating to your representation of Robert W. Trumble, including financial records." During that appearance, he was questioned as follows:

Q    Okay. And did you bring your client files with you?
A [Mr. Nace] I brought -- well, my client files are about four boxes. So I brought everything that I thought would be relevant to this issue.
Q    And did you make copies? Are those copies for us?
A    You can have them, yes.

10

Mr. Nace provided the LDB with documents which, in all, totaled approximately 90 pages.

A little over a year and a half later, on October 10, 2011, a hearing was held before the HPS.[6] Mr. Burke, Mr. Nace, and Mr. Trumble testified at the hearing, and exhibits were submitted. At the hearing, Mr. Nace was asked why he signed the affidavit:

> Q . . . So did you read that application before you signed this affidavit?
> A [Mr. Nace] No.
> Q And why did you sign a document stating that you were accepting employment on the basis of something that you had not seen?
> A Because I recall calling up Mr. Burke and asking about this. "I have this affidavit." And basically he said to me, "Well, you have to sign that and send it back." I said, "Okay."
> . . . .
> Mr. Burke asked me to sign this because it was something that had to be done, and I did it. And I was satisfied if Mike thought I should do it, I'd do it. I had faith in Mike, so I signed it and sent it back.

It was at this same hearing that Mr. Nace reported to the HPS that, contrary to the assertions he had made to the LDB for more than 24 months, he had received the

_____

[6] The HPS granted a motion to allow Mr. Burke and Mr. Nace's proceedings to be heard simultaneously. The HPS also denied Mr. Nace's motion to dismiss the ethics complaint against him.

11

application to employ special counsel and the proposed order attached to Mr. Trumble's

January 27, 2005, letter:

> Q And did you receive the things that were attached to [the January 27, 2005, letter], the copy of the application, the order and the original affidavit?
>
> A [Mr. Nace] It's my recollection that I received the affidavit to sign. When Mr. -- my attorney was down there with me in Washington going through the record -- going through the boxes of records, he found, I believe, an unsigned application and also -- I think that's it. And a proposed order that we've seen since then. But I do not recall seeing that, and I did not have that in my file.
>
> Q So you're saying you didn't receive that or you're saying you don't remember receiving those items?
>
> A I'm saying I do not ever recall seeing anything other than this letter and the affidavit.

Mr. Nace's filing practices for documents related to bankruptcy were also

discussed:

> Q Okay. You do admit though that you have a copy of the signed affidavit, correct?
>
> A [Mr. Nace] Yes.
>
> . . . .
>
> Q So you never would have put that into her medical malpractice case? . . . And you didn't have a section for bankruptcy?
>
> A I wouldn't have had a section for bankruptcy under any circumstances. It was never -- bankruptcy was never on my radar for anything, really, in my practice in 40 years.
>
> We didn't ask people if they were in bankruptcy or had been in bankruptcy. It was not one of the questions that we ask. . . .
>
> Q Well, would you have asked Ms. Miller about it since you signed that affidavit?

A        No. In fact, when I signed the affidavit I probably didn't meet Ms. Miller for many months after that.

Additionally, Mr. Nace was questioned at the hearing as to why he did not produce for the ODC the September 26, 2006 letter from him to Ms. Miller, which was ultimately discovered in Mr. Burke's files:

> CHAIRPERSON KILGORE: Well, what I'm getting at, Mr. Nace, I mean, you provided ODC with the disbursement statement and the settlement statement to Ms. Miller for the 75,000, the check and the disbursement statement for the verdict and the settlement of the verdict also, but not this letter.
>
> [Mr. Nace]: Well, there's a lot of things I didn't provide, lots of things. Because I wasn't -- and I said, "Is there anything else that you want?"
>
> CHAIRPERSON KILGORE: Well, she wouldn't know about this letter, would she?
>
> [Mr. Nace]: No. You can see what I took down, which is about that thick. And I offered -- I told her at the time I have files that are many, many, many files. "Is there anything else you want? You let me know whatever it is." If anybody asked for the entire file, they could have had it.
>
> But I flew from Dulles to Charleston and I wasn't taking all of that with me. I just took some things that I thought might be appropriate. And if she wanted anything else, I told her to ask me for it and tell me what you want. I didn't hear anything else until the charges were brought.

In an affidavit signed two days after the hearing, October 12, 2011, Mr. Nace explained, "As I had never represented Robert W. Trumble, I had no 'complete client file' relating

13

to any representation of Robert W. Trumble, including financial records."[7] He continued, "To be sure, the [ODC] did not request my 'entire file' on the Miller matter . . . . Nevertheless, I, in good faith, took some records to the Appearance, including financial records from the Miller case." He proceeded, "Indeed, the questions by the [LDB] and the subpoena requests, in retrospect, were clearly inartful. That, however, is not my fault." Furthermore, he stated, "It has been explained . . . that 'Lacy' apparently made a copy of [the letter] and placed it in Michael Burke's file. There is no reason for her to do and she should not have done it."

Also at the October 10, 2011, hearing, Mr. Nace was questioned about why he did not follow up with Mr. Trumble after signing the affidavit. He replied,

> I don't know why I would have, first of all. I signed it. I admit that I signed it. But then it was out of my mind once I decided to get in the case and I worked on the case. That's what I did, I worked on the case.
> And I never heard another word from my boss, as I understand it to be, Mr. Trumble. I never heard another word from him, the person who is supposedly, according to the Code, as I now understand it, supervising and watching everything that I did and consulting with me, his so-called employee under the Code, and so I never heard of anything. I never had anything to do with the man.

---

[7] At the October 10, 2011, hearing Mr. Nace expounded that he did not maintain a bankruptcy section in Ms. Miller's file in which to keep copies of his correspondence with Mr. Trumble.

Following the hearing, the HPS dismissed the charges against Mr. Nace as to any violation of Rule 1.5(a)[8] of the Rules of Professional Conduct. The HPS found by clear and convincing evidence that Mr. Nace had violated Rules 1.1, 1.3, 1.4(a) and 1.4(b), 1.15(b), 8.4(c) and 8.4(d) of the Rules of Professional Conduct.[9]

Upon its finding that Mr. Nace violated the Rules, the HPS recommended the following sanctions: (1) that Mr. Nace be suspended from the practice of law for 120 days without any requirement for reinstatement; (2) that Mr. Nace provide community

---

[8] **Rule 1.5. Fees.**

(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services, and;

(8) whether the fee is fixed or contingent.

(In part).

[9] The text of each of these rules is provided *infra* Part III.C.

service through pro bono work for a total of fifty (50) hours; (3) that Mr. Nace satisfy all obligations imposed on him in any final disposition of the pending adversary proceeding filed by the bankruptcy trustee; and (4) that Mr. Nace be ordered to pay the costs of these proceedings pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

On April 24, 2012, Mr. Nace filed a notice of removal to the United States District Court for the Northern District of West Virginia. This Court entered an order staying this disciplinary proceeding on May 7, 2012. On November 7, 2012, the district court ordered that the case be remanded. This Court then proceeded to place the case on the argument docket. Mr. Nace appealed the district court's order to the Fourth Circuit on November 21, 2012, and filed an additional motion to stay with this Court. The Court did not act on the motion to stay, and the appeal to the Fourth Circuit was dismissed on January 25, 2013.

## II.

### STANDARD OF REVIEW

The LDB is responsible for investigating complaints alleging ethics violations.

> "In an attorney disciplinary proceeding based on a complaint charging professional misconduct and prosecuted by the Committee on Legal Ethics of the West Virginia State Bar for publicly reprimanding the attorney and for suspending the license of the attorney to practice law, the burden is on the committee to prove the charges contained in the complaint by

16

full, clear and preponderating evidence." Syl.Pt. 2 of
*Committee on Legal Ethics v. Daniel*, 160 W.Va. 388, 235
S.E.2d 369 (1977).

Syl. pt. 1, *Committee on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

Although the LDB may make recommendations based on its investigations, "[t]his Court

is the final arbiter of legal ethics problems and must make the ultimate decisions about

public reprimands, suspensions or annulments of attorneys' licenses to practice law." *Id.*

at syl. pt. 3.

The standard of review in lawyer disciplinary cases is well settled:

"A *de novo* standard applies to a review of the adjudicatory
record made before the [Lawyer Disciplinary Board] as to
questions of law, questions of application of the law to the
facts, and questions of appropriate sanctions; this Court gives
respectful consideration to the [Board's] recommendations
while ultimately exercising its own independent judgment.
On the other hand, substantial deference is given to the
[Board's] findings of fact, unless such findings are not
supported by reliable, probative, and substantial evidence on
the whole record." Syllabus point 3, *Committee on Legal
Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994).

Syl. pt. 2, *Lawyer Disciplinary Bd. v. Morgan*, 228 W. Va. 114, 717 S.E.2d

898 (2011). Mr. Nace challenges the LDB's finding that he violated any duty to Mr.

Trumble, and accordingly, he alleges that he did not act in such a manner as to warrant

sanctions. Mr. Nace also challenges this Court's jurisdiction over this disciplinary

17

proceeding. We will proceed by applying a *de novo* standard of review to these legal questions.

## III.

## ANALYSIS

In challenging the HPS's recommended sanctions, Mr. Nace presents numerous defenses relating primarily to whether Mr. Nace had formed an attorney-client relationship with Mr. Trumble, and if he did, whether the Court has jurisdiction to determine whether Mr. Nace committed ethics violations. Additionally, Mr. Nace challenges the HPS's findings that he violated the Rules of Professional Conduct and the recommended sanctions. For the reasons discussed below, we find that Mr. Nace did form an attorney-client relationship with Mr. Trumble and that the Court does have jurisdiction to determine whether Mr. Nace committed ethics violations. Furthermore, we agree with the HPS's findings that Mr. Nace violated the Rules of Professional Conduct, and accordingly, we believe sanctions are appropriate.

### A. Attorney-client relationship

Mr. Nace asserts that he was not Mr. Trumble's attorney for purposes of the application of the Rules of Professional Conduct. Specifically, Mr. Nace argues that he was not Mr. Trumble's attorney because (a) as trustee, Mr. Trumble had no right or authority to assert control over Ms. Miller's individual interest in the wrongful death medical malpractice case as Ms. Miller's interest was not an asset of the estate under 11

18

U.S.C. § 541; (b) the bankruptcy court lacked jurisdiction to enter the March 4, 2005, order appointing Mr. Nace as special counsel, and so the order is void *ab initio*; (c) Mr. Nace did not receive notice of the order appointing him special counsel resulting in a lack of mutual assent to the formation of an attorney-client relationship; and (d) a conflict of interest between Mr. Nace and the trustee, Mr. Trumble, existed that would prevent the formation of an attorney-client relationship.

Mr. Nace reminds us in his brief, "This Court knows that the existence of an attorney-client relationship is not determined by the rules of professional conduct." Instead, our common law governs the formation of the attorney-client relationship. *State ex rel. DeFrances v. Bedell*, 191 W. Va. 513, 517, 446 S.E.2d 906, 910 (1994). In *State ex rel. Bluestone Coal Corp. v. Mazzone*, 226 W. Va. 148, 159–60, 697 S.E.2d 740, 751–52 (2010), we discussed the attorney-client relationship:

> Whether an attorney-client relationship has been established is a matter of contract, and such contract may be evidenced either by written agreement or by implication. *See State ex rel. DeFrances v. Bedell*, 191 W.Va. 513, 517, 446 S.E.2d 906, 910 (1994) (per curiam) ("The relationship of attorney and client is a matter of contract, expressed or implied."). Where the attorney-client relationship has arisen by implication, we explicitly have "recognized that the attorney-client relationship can exist without an agreement for compensation[, and] an attorney-client relationship may be implied from the conduct of the parties." *Committee on Legal Ethics of the West Virginia State Bar v. Simmons,* 184 W. Va. 183, 186, 399 S.E.2d 894, 897 (1990) (per curiam) (citations omitted).

19

Furthermore, we have recognized that "[t]he determination of the existence of an attorney-client relationship depends on each case's specific facts and circumstances." *State ex rel DeFrances*, 191 W. Va. at 517, 446 S.E.2d at 910. Ultimately, we again look to the long-held precedent set forth in syl. pt. 1, *Keenan v. Scott,* 64 W. Va. 137, 61 S.E. 806 (1908):

> As soon as a client has expressed a desire to employ an attorney and there has been a corresponding consent on the part of the attorney to act for him in a professional capacity, the relation of attorney and client has been established; and all dealings thereafter between them relating to the subject of the employment will be governed by the rules applicable to such relation.

Mr. Nace argues before this Court that he did not enter into an attorney-client relationship with Mr. Trumble. We disagree, finding the above quoted law dispositive.

*Keenan* requires two actions for the formation of an attorney-client relationship: (1) that the client express a desire to employ the attorney and (2) that there be a corresponding consent on the part of the attorney to act for him in a professional matter. The specific facts of this case, when applied to each of these elements, illustrate the formation of the attorney-client relationship between Mr. Nace and Mr. Trumble.

20

Undoubtedly, Mr. Trumble expressed a desire to employ Mr. Nace. This was evident through the January 27, 2005, letter sent from Mr. Trumble's office to Mr. Nace. The letter, which was accompanied by an application to employ special counsel, a proposed order, and an affidavit, asked that Mr. Nace sign the affidavit if the documents met to his approval. The first element of *Keenan* is satisfied.

The second element of *Keenan* is also satisfied. By signing the affidavit and returning it to Mr. Trumble, Mr. Nace expressed a corresponding consent to act for Mr. Trumble in a professional manner. The affidavit Mr. Nace signed said, "I, Barry J. Nace, Esquire, declare: . . . That I am willing to accept employment by the Trustee on the basis set forth in the Application of Employ filed simultaneously herewith." Mr. Nace's willingness to accept employment was conditioned on entry of the corresponding order in the bankruptcy court. Because the order was entered, his willingness to accept employment was perfected, and he became Mr. Trumble's attorney as of the date of the entry of the order, March 4, 2009.[10] Under the facts of this case, it is inconsequential to the formation of the attorney-client relationship whether Mr. Nace received notice that the order appointing him special counsel had been entered in the bankruptcy court;

---

[10] This Court does not have jurisdiction to determine whether the order was valid; however, the validity of the order is irrelevant to whether an attorney-client relationship formed in this case. We do note, however, that if the order is ultimately found to be invalid, while it will not nullify the attorney-client relationship, it may affect Mr. Nace's liability.

21

formation of the attorney-client relationship in this case was conditioned on entry of the order, not entry of the order *and* delivery of notice to Mr. Nace.[11]

We continue by recognizing that, as is evident from the facts of this case, any reasonable attorney, especially one with more than 40 years of experience, would have expected that an attorney-client relationship had formed. Mr. Trumble sent the January 27, 2005, special counsel employment letter to Mr. Burke and Mr. Nace. Both attorneys were specifically chosen to act as special counsel for Mr. Trumble because, through their involvement in Ms. Miller's case, they were uniquely situated to protect the interests of Mr. Trumble. This is a common practice. A reasonable attorney in Mr. Nace's position would have expected that upon returning the affidavit, Mr. Trumble would deliver the same to the bankruptcy court and an order would be entered appointing him special counsel. In fact, Mr. Nace admitted to expecting that exact scenario. The January 27, 2005, letter accompanying the affidavit stated that Mr. Trumble would "transmit the documentation to the Bankruptcy Court for approval," and Mr. Nace, as demonstrated by his own testimony during a deposition taken on May 24, 2011, knew that Mr. Trumble would be submitting the affidavit to the bankruptcy court upon receipt from Mr. Nace:

---

[11] Although Mr. Nace has vehemently denied having any knowledge of bankruptcy law prior to the commencement of this disciplinary proceeding, it is not clear from the record whether Mr. Nace knew, at the time he signed the affidavit, that he should receive notice of the entry of the order appointing him special counsel.

Q. Mr. Trumble specifically told you upon return of the executed Affidavit he would be submitting the application to have you approved as special counsel, correct?

A. [Mr. Nace] That's what he said he was going to do. And as I understand it, the court then had to do that, had to employ me. And I was never given any notice that I was employed by the court or by your client, that your client has admitted, which certainly sounds like a lot of negligence on his part to me.

In finding that an attorney-client relationship did exist between Mr. Nace and Mr. Trumble, we find no merit in the remainder of Mr. Nace's arguments involving this issue. Whether Mr. Trumble had the authority to assert control over Ms. Miller's interest in her case is irrelevant to the formation of an attorney-client relationship in this case for the reasons already stated. This issue goes to the liability of Mr. Trumble and Mr. Nace, and as such, it is outside of the jurisdiction of this Court. Mr. Nace's claim that a conflict of interest exists between himself and Mr. Trumble would also not affect the formation of an attorney-client relationship. If a conflict does exist, it is Mr. Nace's responsibility to take the appropriate action to protect Mr. Trumble's interests.

### B. Jurisdiction

In finding that Mr. Nace did form an attorney-client relationship with Mr. Trumble, we proceed to address Mr. Nace's second general argument challenging this Court's jurisdiction. Specifically, Mr. Nace alleges that his representation of Mr. Trumble is controlled by the order appointing Mr. Nace as special counsel in the bankruptcy court and that this Court lacks subject matter jurisdiction to determine whether Mr. Nace

violated the duties and responsibilities described in the order. Additionally, Mr. Nace argues that Mr. Trumble exceeded his authority as bankruptcy trustee by filing an ethics complaint against Mr. Nace, and so the ethics complaint must be dismissed.

The Supreme Court of Appeals retains the ultimate authority to regulate and control the practice of law in West Virginia, and this authority is vested in the Court by the West Virginia Constitution. Syl. pt. 3, *Committee on Legal Ethics v. Karl*, 192 W. Va. 23, 449 S.E.2d 277 (1994) ("'In the exercise of their inherent power the courts may supervise, regulate and control the practice of law by duly authorized attorneys and prevent the unauthorized practice of law by any person, agency or corporation.' Syl. pt. 10, *West Virginia State Bar v. Early*, 144 W.Va. 504, 109 S.E.2d 420 (1959)."); Syl. pt. 1, *State ex rel. Askin v. Dostert*, 170 W. Va. 562, 295 S.E.2d 271 (1982) ("The exclusive authority to define, regulate and control the practice of law in West Virginia is vested in the Supreme Court of Appeals."); Syl. pt. 7, in part, *W. Va. State Bar v. Earley*, 144 W. Va. 504, 109 S.E.2d 420 (1959) ("[T]he Legislature can not restrict or impair this power of the courts or permit or authorize laymen to engage in the practice of law."); *see also Chevy Chase Bank v. McCamant*, 204 W. Va. 295, 302, 512 S.E.2d 217, 224 (1998) ("[T]he [West Virginia Consumer Credit Protection Act] is not designed to regulate the practice of law. . . . This Court's exclusive authority to govern the practice of law is a constitutional mandate."); Syl. pt. 2, *Lawyer Disciplinary Bd. v. Kupec*, 202 W. Va. 556, 505 S.E.2d 619 (1998) ("The authority of the Supreme Court to regulate and control the practice of law in West Virginia, including the lawyer disciplinary process, is

24

constitutional in origin. W.Va. Const. art. VIII, § 3."); *Lawyer Disciplinary Bd. v. Farber*, 200 W. Va. 185, 189, 488 S.E.2d 460, 464 (1997) ("[T]he [LDB] of the West Virginia State Bar, through its Disciplinary Counsel and Hearing Panel Subcommittee, is functioning . . . 'as an administrative arm of this Court.' *Lawyer Disciplinary Bd. v. Vieweg*, 194 W.Va. 554, 558, 461 S.E.2d 60, 64 (1995).").

Pursuant to the Court's authority over the practice of law in the state, the Court has promulgated the Rules of Professional Conduct by which lawyers admitted to the West Virginia bar must abide. Violations of these rules are subject to review by the LDB, pursuant to the Rules of Lawyer Disciplinary Procedure, and subsequently, by this Court.

To the extent that Mr. Nace entered into an attorney-client relationship with Mr. Trumble, Mr. Nace practiced law in West Virginia. It is patently clear from our case law that the Court has the authority to supervise, regulate and control the practice of law in this state, and so the Court has subject matter jurisdiction over Mr. Nace's practice of law in West Virginia. Contrary to Mr. Nace's suggestion, the Court is not divested of jurisdiction merely because the order appointing him as special counsel was entered in the bankruptcy court. The disciplinary proceeding before this Court is not contingent upon the construction of the order appointing him special counsel; instead, it depends only on whether an attorney-client relationship formed, which did occur. The duties and

25

responsibilities the LDB asserts Mr. Nace owed to Mr. Trumble and violated are those dictated by the Rules of Professional Conduct, not those required by the order.[12]

As an attorney in West Virginia, Mr. Trumble had an affirmative duty to inform the ODC of his belief that Mr. Nace had committed violations of the Rules of Professional Conduct. Rule 8.3(a) states, "A lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority." The duty to report is independent of Mr. Trumble's position as trustee; the duty arises from his membership in the West Virginia bar. Therefore, we conclude that this disciplinary proceeding is properly before this Court.

## C. Sanctions

The HPS found by clear and convincing evidence that Mr. Nace had violated Rules 1.1, 1.3, 1.4(a) and 1.4(b), 1.15(b), 8.4(c) and 8.4(d) of the Rules of Professional Conduct. For these violations, the HPS recommended sanctions including

---

[12] Because we do not have the subject matter jurisdiction to do so, this Court does not make any determination as to whether Mr. Nace has violated any duties or responsibilities owed to Mr. Trumble under the order entered in bankruptcy court. Our findings in this opinion are limited only to those duties owed pursuant to Mr. Nace's practice of law in West Virginia.

the suspension of Mr. Nace's license to practice law for 120 days. When reviewing the

sanctions imposed by the HPS, this Court considers a number of factors. We have held,

> Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors."

Syl. pt. 4, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d

722 (1998). Moreover,

> [i]n deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.

Syl. pt. 3, *Committee on Legal Ethics of the West Virginia State Bar v. Walker*, 178 W.

Va. 150, 358 S.E.2d 234 (1987). The undisputed facts in this case support the HPS's

findings that Mr. Nace violated the Rules of Professional Conduct.

27

Rule 1.1, entitled "Competence", states, "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Rule 1.3, entitled "Diligence", states, "A lawyer shall act with reasonable diligence and promptness in representing a client." Mr. Nace ardently denies having any knowledge of bankruptcy law prior to signing the affidavit, and he insists that his ignorance as to bankruptcy law persisted until the commencement of this disciplinary proceeding against him. He negligently failed to acquire the legal knowledge and skill to adequately represent Mr. Trumble during the course of his representation of Mr. Trumble, even after Mr. Burke withdrew from representation of Ms. Miller. This behavior also indicates a lack of diligence on Mr. Nace's part to acquire the skills needed to adequately represent his client. Therefore, Mr. Nace violated Rules 1.1 and Rule 1.3.

The undisputed facts indicate that Mr. Nace also did not adequately communicate with Mr. Trumble. Mr. Nace did not make any attempts to communicate with Mr. Trumble between early 2005 when he signed and returned the affidavit and October 2008 when he responded to Mr. Trumble's request for communication in October of 2008. Events pertinent to Mr. Nace's representation of Mr. Trumble of which Mr. Trumble should have been apprised occurred during this time frame. Rule 1.4, "Communication", states, "(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information. (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to

28

make informed decisions regarding the representation." Mr. Nace violated Rules 1.4(a) and 1.4(b) by failing to keep Mr. Trumble reasonably informed about the status of Ms. Miller's case so that Mr. Trumble could make informed decisions regarding the representation.

Mr. Nace also violated Rule 1.15(b). This rule required that Mr. Nace, upon receiving the relevant funds in Ms. Miller's case in which Mr. Trumble had an interest, notify Mr. Trumble. The rule, entitled "Safekeeping Property", states, in part, "Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person." As stated above, after returning the affidavit to Mr. Trumble, Mr. Nace's next communication with Mr. Trumble was more than a year and a half after the final jury verdict was entered in Ms. Miller's case and more than six months after Mr. Nace distributed the funds from Ms. Miller's case. Moreover, Mr. Nace's renewed communication with Mr. Trumble commenced only after Mr. Trumble contacted Mr. Nace.

We agree with the LDB that Mr. Nace violated Rule 8.4(c). This subsection under the rule titled "Misconduct" states that "[i]t is professional misconduct for a lawyer to: . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation." The record reflects that Mr. Nace was dishonest with Mr. Trumble regarding the proceeds of the partial settlement. Mr. Trumble, in his November 14, 2008, letter, requested settlement documents. Mr. Nace's response letter stated more than once that there was no

29

settlement. We will not parse semantics; a partial settlement is a settlement, and Mr. Nace was knowingly untruthful about the settlement with Mr. Trumble. This is a violation of Rule 8.4(c), which states that it is professional misconduct for an attorney to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

Finally, we find that Mr. Nace violated Rule 8.4(d), which declares that it is professional misconduct for an attorney to "engage in conduct that is prejudicial to the administration of justice." Mr. Nace received a subpoena duces tecum requesting his complete client file relating to his representation of Mr. Trumble. In his October 12, 2011, affidavit, Mr. Nace asserted that he never had a Trumble file. It is not clear why Mr. Nace did not advise the LDB of this fact at the time he received the subpoena, at the April 7, 2010, hearing, or at the October 10, 2011, hearing. This behavior alone does not indicate a nefarious intent. However, Mr. Nace did provide select documents from his Miller file, which shows that he knew the relevant documents—the documents the LDB were seeking—were actually those in his Miller file. Furthermore, he made no indication when submitting those documents at the April 7, 2010, hearing that the documents were not from his Trumble file. We note also that the September 26, 2008, letter from Mr. Nace to Ms. Miller, which appears to contradict Mr. Nace's sworn statements concerning his knowledge of the bankruptcy proceedings, was not included in the documents Mr. Nace provided to the LDB—it was only discovered after an examination of Mr. Burke's files. Finally, we are cognizant that Mr. Nace represented to the LDB for over 24 months that he did not receive from Mr. Trumble a copy of the application to employ special

counsel and the proposed order, yet a review of his Miller files by his current counsel prior to the October 10, 2010, hearing revealed these documents. Based on these facts, this Court can reach no other conclusion than that Mr. Nace intentionally obfuscated the investigation of the LDB in violation of Rule 8.4(d).

The harm caused by Mr. Nace's conduct is substantial. Initially, we recognize that attorneys who engage in professional misconduct, particularly conduct that is deceitful, damage the public's confidence in the bar and the legal profession. The harm to Mr. Trumble's interests, while not completely definite at present, is also potentially great.[13] In deciding the appropriate sanction in this case, we are mindful that the sanction must be designed to adequately restore public confidence in the bar.

The Court considers mitigating factors in lawyer disciplinary cases. "Mitigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." Syl. pt. 2, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003). We have further explained that

> [m]itigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1)

---

[13] The bankruptcy court is the proper body to determine what portion of Ms. Miller's malpractice award Mr. Trumble should have received from Mr. Nace.

absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.

*Id.* at syl. pt. 3. There are mitigating factors present in this case that weigh in favor of Mr. Nace. He has no history of ethics violations in West Virginia or the other jurisdictions in which he has been admitted to practice in his practice spanning more than 40 years. Additionally, the Court recognizes that he is esteemed among his peers.

The Court must also consider aggravating factors. "Aggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." *Id.* at syl. pt. 4. Of the aggravating factors in this case, most notable is Mr. Nace's refusal to accept any hint of responsibility for the harm caused by his failure to properly represent Mr. Trumble, for his dishonest conduct, or for obscuring a full investigation by the LDB. Instead, Mr. Nace has repeatedly shifted responsibility onto others. In his brief to this Court, Mr. Nace writes extensively on Mr. Trumble's duties as trustee and how Mr. Trumble did not fulfill his responsibilities as trustee. While this Court is not in any position to evaluate Mr.

32

Trumble's responsibilities as trustee—the matter is not properly before this Court[14]—there is ample evidence that Mr. Nace, as Mr. Trumble's attorney, had his own set of duties and responsibilities that he failed to perform. Mr. Trumble is Mr. Nace's client, not the other way around.

When Mr. Nace was questioned by the HPS as to why the September 26, 2006, letter he sent to Ms. Miller was not included in the documents he submitted to the LDB, he again shifted blame, this time to the LDB. In his October 12, 2011, affidavit, Mr. Nace said, "Indeed, the questions by the [LDB] and the subpoena requests, in retrospect, were clearly inartful. That, however, is not my fault." As we discussed above, it is apparent to us that Mr. Nace was aware of the documents the LDB desired—documents related to Ms. Miller's bankruptcy and Mr. Nace's representation of Mr. Trumble—but he deliberately avoided producing them.

---

[14] In his brief, Mr. Nace asserts,

> HPS' statement that it "makes no finding whatsoever about whether the bankruptcy Trustee acted appropriately or inappropriately in this matter" reveals its refusal to objectively evaluate and consider Nace's legitimate, credible factual and legal defense in this most important matter. . . . Such action by the HPS is arbitrary and violates Nace's constitutional due process rights in providing a factual and legal defense to the charges and arguing same in mitigation.

Mr. Trumble's misconduct, in the context of this proceeding, was not within the purview of the HPS. The HPS did not violate Mr. Nace's due process rights in failing to examine Mr. Trumble's actions.

The aggravating factors far outweigh the mitigating factors in this case. It is the finding of this Court that the sanctions recommended by the HPS are adequate to punish Mr. Nace, to serve as a deterrent to other members of the bar, and to restore public confidence in the ethical standards of the legal profession.

## IV.

## CONCLUSION

For the foregoing reasons, the Court adopts the recommendations presented by the HPS in its March 21, 2012, report, imposing the following discipline upon Mr. Nace: that he be suspended from the practice of law for 120 days without any requirement for reinstatement; that he provide community service through pro bono work for a total of 50 hours; that he satisfy any obligations imposed on him in the final disposition of the pending adversary proceeding in the United States Bankruptcy Court for the Northern District of West Virginia filed by the bankruptcy trustee, Mr. Trumble; and that he be ordered to pay the costs of the proceedings before the HPS pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

Recommendations Adopted.